**FEE PAID**                                        FILED

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**    2025 SEP 12 AM 11: 01

**2:25-CV-08668-CV-KSx**

JUAN ESCO,

Case No.

      Plaintiff,

**COMPLAINT FOR INJUNCTIVE RELIEF**

      v.

UNITED STATES DEPARTMENT OF JUSTICE; and FEDERAL BUREAU OF INVESTIGATION,

      Defendant

## INTRODUCTION

1.    Plaintiff Juan Esco, proceeding pro se, brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the release of three FBI records that were introduced as trial exhibits and played in open court: two audio recordings (**Exhibits 3-A and 4-A**) and one covert video recording (**Exhibits 6-A and 6-B**).

2.    These exhibits captured incriminating statements by Fereidoun "Fred" Khalilian in furtherance of a murder-for-hire conspiracy targeting Plaintiff. Plaintiff was the intended victim of that conspiracy, which arose in retaliation for Plaintiff's work on a documentary film exposing Khalilian's fraudulent activities. The recordings were authenticated by FBI witnesses, admitted into evidence without restriction, and presented to the jury during Khalilian's October 2023 federal trial in the Central District of California.

3.    Despite their use in open court, the FBI has refused to release the recordings under FOIA. The Department of Justice's Office of Information Policy has already ruled that

1

Exemption 7(A) ("ongoing proceeding") no longer applies, yet the FBI continues to withhold the exhibits in full.

4.    On September 10 and 11, 2025, OIP issued its final determinations affirming the FBI's withholding, this time invoking Exemptions 6 and 7(C) (privacy).

5.    FOIA does not permit this. Once agency records have been introduced in a public judicial proceeding, they lose any "protective cloak" that FOIA exemptions might otherwise provide. *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999). Plaintiff has further made clear that he will accept appropriately redacted versions if necessary to protect non-public information.

6.    Plaintiff brings this action to enforce FOIA's mandate of transparency and to obtain the same evidence the jury, the court, and the press have already seen and heard. Coverage in *The Washington Post* and *Los Angeles Times* has already described the contents of these recordings, underscoring the strong public interest in their disclosure.

7.    As the victim whose life was targeted, Plaintiff also has a compelling personal interest in reviewing the very evidence of those threats. The public and the victim alike have a right to access these exhibits, which the FBI and DOJ improperly continue to withhold.

**JURISDICTION AND VENUE**

8.    This Court has jurisdiction over this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B), which grants district courts jurisdiction to enjoin an agency from withholding agency records and to order the production of any records improperly withheld.

9.    This Court also has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

10.    Venue is proper in this District pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because Plaintiff resides in this District and the records requested are maintained by agencies of the United States.

## PARTIES

11.    **Plaintiff Juan Esco** is a United States citizen residing in Los Angeles, California. He was the intended victim of the murder-for-hire conspiracy underlying *United States v. Khalilian* and has a direct, compelling interest in the requested records.

12.    **Defendant United States Department of Justice ("DOJ")** is a federal executive department and an "agency" within the meaning of 5 U.S.C. § 552(f)(1). DOJ has possession and control over the records requested by Plaintiff.

13.    **Defendant Federal Bureau of Investigation ("FBI")** is a component of DOJ and an "agency" within the meaning of 5 U.S.C. § 552(f)(1). The FBI conducted the underlying investigation, introduced the records at trial, and was the component that received and denied Plaintiff's FOIA requests.

## FACTUAL BACKGROUND

14.    Plaintiff Juan Esco was the intended victim of a murder-for-hire plot orchestrated by Fereidoun "Fred" Khalilian.

15.    Instead of carrying out the plot, Michael Sherwood cooperated with Plaintiff and later with the FBI. Together they staged Plaintiff's "death" using photographs and props. The FBI then directed Sherwood to engage in monitored phone calls with Khalilian and later outfitted Sherwood's vehicle with a covert recording device to capture in-person meetings.

3

16.    On March 23, 2023, at 10:27 a.m., Sherwood and Khalilian participated in a recorded call that was introduced at trial as **Exhibit 3A (ZOOM0007.MP3)**. In that call, Sherwood told Khalilian that "the ones that took out Juan" were asking for more money. Khalilian responded without hesitation: "No problem." He asked, "How much you want me to send?" and agreed to send an additional payment of $1,000 to each man. Sherwood instructed him to use Zelle, and Khalilian concluded, "Ok I'll send it right now." This exhibit was admitted into evidence and played publicly to the jury.

17.    Later that same morning, at 11:18 a.m., Sherwood placed another FBI-directed call to Khalilian, introduced as **Exhibit 4A (ZOOM0008.MP3)**. In this call, Sherwood told Khalilian he had already paid the men who "helped" with Plaintiff's supposed killing. Khalilian responded: "Thank you, thank you, sir. His body, nobody is going to be able to find him, huh?" Sherwood replied, "No, no one's going to be able to find him." Khalilian acknowledged, "Alright, cool," and laughed as Sherwood joked about whether he wanted a souvenir. Khalilian replied, "Yeah, they like to cut heads and fingers and shit." This exhibit too was admitted into evidence and publicly played in open court.

18.    On June 21, 2023, the FBI sting operation culminated in a meeting in Las Vegas. Agents placed a covert camera disguised inside a baseball cap on the dashboard of Sherwood's Porsche, which secretly recorded Khalilian making further incriminating statements. On the recording, Khalilian admitted: "I was going to kill him myself. I bought a gun, I was coming to LA. You saved me from myself. I was going to kill him. I was going to stand outside of his place till he comes out. I was going to fucking shoot him in his fucking head." This covert video was

introduced at trial as **Exhibits 6A and 6B (Recording 0541.001.cam1.mp4)** and played in open court before the jury.

19.     In October 2023, Khalilian was tried in the Central District of California for murder-for-hire, in *United States v. Khalilian*, Case No. 2:23-cr-00331-DSF. During that four-day trial, prosecutors introduced and played to the jury Exhibits 3A, 4A, and 6A/6B, each authenticated by FBI witnesses and admitted without seal or restriction.

20.     The trial attracted national media coverage. *The Washington Post* and *Los Angeles Times* reported extensively on the FBI sting, Plaintiff's role in staging his "death," and Khalilian's recorded admissions, describing the substance of the exhibits.

21.     After several days of testimony, the trial court dismissed the murder-for-hire charge on venue grounds. Khalilian was later re-indicted in the District of Nevada, where, pursuant to a binding plea agreement, he pled guilty to witness tampering. As part of that plea deal, the murder-for-hire charge was dismissed without prejudice. The criminal proceedings are now concluded, and the murder-for-hire matter is fully closed.

**PROCEDURAL HISTORY UNDER FOIA**

22.     On **July 16, 2024**, Plaintiff submitted a FOIA request to the FBI seeking copies of the recordings introduced as Exhibits 3A, 4A, and 6A/6B.

23.     On **August 2, 2024**, the FBI denied the request, citing Exemption 7(A) (ongoing enforcement proceedings).

24.     On **August 14, 2024**, Plaintiff timely appealed the denial to the Department of Justice, Office of Information Policy ("OIP").

25.    On **September 17, 2024**, OIP issued a decision remanding the request to the FBI for further processing, finding that Exemption 7(A) was no longer a valid basis for categorical withholding.

26.    On **October 9, 2024**, the FBI again refused to release the requested records.

27.    On **October 18, 2024**, Plaintiff submitted a supplemental appeal to OIP, emphasizing that the requested exhibits had been admitted into evidence and played in open court.

28.    On **January 6, 2025**, OIP issued another remand, ordering the FBI to conduct further processing of Plaintiff's request.

29.    On **March 25, 2025**, the FBI again denied the request, once more invoking Exemption 7(A).

30.    On **April 3, 2025**, Plaintiff filed an additional appeal to OIP.

31.    On **April 4, 2025**, the FBI issued a substantially identical denial, again citing Exemption 7(A)

32.    On **September 10 and 11, 2025**, OIP issued its final determinations (Appeal Nos. A-2025-01174 and A-2025-01224), this time affirming the FBI's withholding under Exemptions 6 and 7(C) (privacy). Plaintiff has therefore exhausted all available administrative remedies.

## CLAIM FOR RELIEF

33.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 32.

34.    The requested recordings — **Exhibit 3A (March 23, 2023, 10:27 a.m., ZOOM0007.MP3 recorded call), Exhibit 4A (March 23, 2023, 11:18 a.m., ZOOM0008.MP3**

6

recorded call), and Exhibits 6A/6B (June 21, 2023 FBI sting video, 0541.001.cam1.mp4) — are "agency records" within the meaning of FOIA, because they were created, obtained, and maintained by the FBI in the course of its law-enforcement activities.

35. These exhibits were admitted into evidence during Khalilian's October 2023 trial, authenticated by FBI witnesses, and publicly played in open court. They contain Khalilian's own incriminating statements, including his agreement to send money via Zelle to supposed killers, his remarks that Plaintiff's body would "never be found," his laughter about "cutting heads and fingers," and his admission that he personally intended to shoot Plaintiff in the head.

36. Defendants DOJ and FBI have improperly withheld these trial exhibits in violation of FOIA.

37. Once agency records are played in open court, they lose any "protective cloak" that FOIA exemptions might otherwise provide. *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999); *ACLU of N. Cal. v. DOJ*, 880 F.3d 473, 491 (9th Cir. 2018); *Tax Analysts v. DOJ*, 492 U.S. 136, 151–54 (1989).

38. Exemptions 6 and 7(C) cannot justify withholding here. Any privacy interests were waived or substantially diminished by the public use of these exhibits at trial and by widespread press coverage. The only individuals captured are persons whose identities and actions were already disclosed in open court: Khalilian himself, whose privacy interest in his own threats is minimal; and Sherwood, the cooperating witness whose testimony and role were revealed at trial. Any incidental identifiers of FBI personnel or third parties can be protected by redactions.

39. FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided … after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Plaintiff has expressly agreed to accept redactions necessary to protect personal identifiers or sensitive law-enforcement details. In the alternative, the Court may conduct in camera review to determine segregability and verify the absence of valid exemptions.

40. Defendants' refusal to release these exhibits, in whole or in part, violates FOIA's mandate of disclosure and improperly deprives Plaintiff and the public of access to agency records already made part of the public record.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare that Defendants' withholding of the requested records violates the Freedom of Information Act, 5 U.S.C. § 552;

2. Order Defendants to promptly release Exhibit 3A (ZOOM0007.MP3), Exhibit 4A (ZOOM0008.MP3), and Exhibits 6A/6B (0541.001.cam1.mp4), subject only to lawful and narrowly tailored redactions as permitted by FOIA;

3. Enjoin Defendants from continuing to withhold non-exempt portions of these records;

4. In the alternative, order Defendants to submit the requested records for in camera inspection to determine segregability and verify the absence of valid exemptions;

5. Award Plaintiff his costs of litigation, including reasonable attorney fees and expenses, pursuant to 5 U.S.C. § 552(a)(4)(E); and

6.    Grant such other and further relief as the Court deems just and proper.

DATED: September 12, 2025

Respectfully submitted,

/s/ Juan Esco

**JUAN ESCO,**
Plaintiff, Pro Se

640 S Curson Ave, #916
Los Angeles, CA 90036
Phone: (310) 900-9501
Email: juanesco@me.com

9

## EXHIBIT INDEX

Plaintiff attaches the following exhibits in support of this Complaint:

- **Exhibit A** – Plaintiff's July 16, 2024 FOIA request to the FBI.

- **Exhibit B** – FBI denial letter dated August 2, 2024 (citing Exemption 7(A)).

- **Exhibit C** – Plaintiff's appeal to the Office of Information Policy, dated August 14, 2024.

- **Exhibit D** – OIP remand decision dated September 17, 2024.

- **Exhibit E** – FBI denial letter dated October 9, 2024.

- **Exhibit F** – Plaintiff's supplemental appeal to OIP, dated October 18, 2024.

- **Exhibit G** – OIP remand decision dated January 6, 2025.

- **Exhibit H** – FBI denial letter dated March 25, 2025 (again citing Exemption 7(A)).

- **Exhibit I** – Plaintiff's April 3, 2025 appeal to OIP.

- **Exhibit J** – FBI denial letter dated April 4, 2025.

- **Exhibit K** – OIP final determinations dated September 10 and 11, 2025.

- **Exhibit L** – Trial transcript excerpts (October 2023), reflecting the admission and public playing of Exhibits 3A, 4A, and 6A/6B.

- **Exhibit M** – *Los Angeles Times* article (July 10, 2023) reporting on the FBI sting operation.

- **Exhibit N** – *Washington Post* article (December 5, 2023) describing Khalilian's recorded admissions and the federal prosecution.

# EXHIBIT A

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 12 of 103   Page ID
#:12
FOIA.gov - Freedom of Information Act: Create a request                                    7/16/24, 10:52 AM

 An official website of the United States government
Here's how you know ⌄

UNITED STATES DEPARTMENT *of* JUSTICE

 **FOIA.gov**

MENU

Thank you for visiting FOIA.gov, the government's central website for FOIA. We'll continue to make improvements to the site and look forward to your input. Please submit feedback to National.FOIAPortal@usdoj.gov.

**Submission ID:** 1309571

# Success!

## Your FOIA request has been created and is being sent to the Federal Bureau of Investigation.

You'll hear back from the agency confirming receipt in the coming weeks using the contact information you provided. If you have questions about your request, feel free to reach out to the agency FOIA personnel using the information provided below.

**Contact the agency**

👤 FOIA Requester Service Center 📖

540-868-4593

👤 Shannon Hammer, FOIA Public Liaison 📖

540-868-2101

✉️ Michael G. Seidel, Section Chief, Record/Information Dissemination Section
200 Constitution Drive
Winchester, VA 22602

# Request summary

Request submitted on **July 16, 2024.**

The confirmation ID for your request is **1309571**.

> The confirmation ID is only for identifying your request on FOIA.gov and acts as a receipt to show that you submitted a request using FOIA.gov. This number does not replace the information you'll receive from the agency to track your request. In case there is an issue submitting your request to the agency you selected, you can use this number to help.

## Contact information

**Name**
Juan Esco

**Mailing address**
640 S CURSON AVE
916
LOS ANGELES, CA 90036
US

**Phone number**
3109009501

## Your request

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 14 of 103    Page ID
#:14
FOIA.gov - Freedom of Information Act: Create a request                                    7/16/24, 10:52 AM

I would like to get a copy of the FBI-monitored recording device for Case No. 2:23-CR-00331-DSF. In this recording the defendant is heard saying the following: "I was going to kill him myself. I bought a gun, I was coming to LA. You saved me from myself. I was going to kill him. I was going to stand outside of his place till he comes out. I was going to fucking shoot him in his fucking head."

## Additional information

  Passport.jpeg

**What is the subject of your request?**
myself

**Date of birth**
08/12/1985

**Signature (typed)**
J ESCO

**I am making this request on behalf of**
myself

**Are you a US citizen?**
yes

**By providing an electronic signature below I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. Section 552(a)(3) by a fine of not more than $5,000.**
yes

**Today's date**

07/16/2024

**Place of birth**
Miami, FL

## Fees

**What type of requester are you?**
other

**Fee waiver**
option4

**The amount of money you're willing to pay in fees, if any**
100

## Request expedited processing

**Expedited processing**
no



## CONTACT

Office of Information Policy (OIP)
U.S. Department of Justice
441 G St, NW, 6th Floor
Washington, DC 20530
E-mail: National.FOIAPortal@usdoj.gov

Hero image credit � CC3.0

❘ FREQUENTLY ASKED QUESTIONS

❘ DEVELOPER RESOURCES

❘ AGENCY API SPEC

❘ FOIA CONTACT DOWNLOAD

❘ FOIA DATASET DOWNLOAD

❘ ACCESSIBILITY

❘ PRIVACY POLICY

❘ POLICIES & DISCLAIMERS

❘ JUSTICE.GOV

❘ USA.GOV �

# EXHIBIT B



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

August 2, 2024

JUAN ESCO
NUMBER 916
640 SOUTH CURSON AVENUE
LOS ANGELES, CA 90036

> FOIPA Request No.: 1641150-0
> Subject: ESCO, JUAN
> (Recording Device Copy from Court Case
> Number 2:23-CR-00331-DSF)

Dear Juan Esco:

This responds to your Freedom of Information/Privacy Acts (FOIPA) request. Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

The FBI has completed its search for records subject to the FOIPA that are responsive to your request. The material you requested is located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). 5 U.S.C. § 552(b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only
> to the extent that the production of such law enforcement records or
> information ... could reasonably be expected to interfere with
> enforcement proceedings...

The records responsive to your request are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings. Therefore, your request is being administratively closed. For a further explanation of this exemption, see the enclosed Explanation of Exemptions.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. **"Part 1"** of the Addendum includes standard responses that apply to all requests. **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third party individuals. **"Part 3"** includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

Additional information about the FOIPA can be found at www.fbi.gov/foia. Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov. Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by emailing the FBI's FOIA Public Liaison at foipaquestions@fbi.gov.   The subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.   You may also contact the Office of Government Information Services (OGIS).   The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosures

## FBI FOIPA Addendum

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request.   Part 1 of the Addendum includes standard responses that apply to all requests. Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information.   Part 3 includes general information about FBI records, searches, and programs.

Part 1: The standard responses below apply to all requests:

(i)      **5 U.S.C. § 552(c).**   Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)].   FBI responses are limited to those records subject to the requirements of the FOIPA.   Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii)     **Intelligence Records.**   To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)].   The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)].   This is a standard response and should not be read to indicate that any such records do or do not exist.

Part 2: The standard responses below apply to all requests for records on individuals:

(i)      **Requests for Records about any Individual—Watch Lists.**   The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)].   This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii)     **Requests for Records about any Individual—Witness Security Program Records.**   The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)].   This is a standard response and should not be read to indicate that such records do or do not exist.

(iii)    **Requests for Confidential Informant Records.** The FBI can neither confirm nor deny the existence of confidential informant records pursuant to FOIA exemptions (b)(7)(D), (b)(7)(E), and (b)(7)(F) [5 U.S.C.§ § 552 (b)(7)(D), (b)(7)(E), and (b)(7)(F)] and Privacy Act exemption (j)(2) [5 U.S.C.§ 552a (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records would reveal confidential informant identities and information, expose law enforcement techniques, and endanger the life or physical safety of individuals. This is a standard response and should not be read to indicate that such records do or do not exist.

Part 3: General Information:

(i)      **Record Searches and Standard Search Policy.**   The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems, such as the Central Records System (CRS), or locations where responsive records would reasonably be found. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions.   The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. The standard search policy is a search for main entity records in the CRS. Unless specifically requested, a standard search does <u>not</u> include a search for reference entity records, administrative records of previous FOIPA requests, or civil litigation files.

   a.   *Main Entity Records* – created for individuals or non-individuals who are the subjects or the focus of an investigation
   b.   *Reference Entity Records*- created for individuals or non-individuals who are associated with a case but are not known subjects or the focus of an investigation

(ii)     **FBI Records.**   Founded in 1908, the FBI carries out a dual law enforcement and national security mission.   As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii)    **Foreseeable Harm Standard.**   As amended in 2016, the Freedom of Information Act provides that a federal agency may withhold responsive records only if: (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates, or (2) disclosure is prohibited by law (5 United States Code, Section 552(a)(8)(A)(i)).   The FBI considers this foreseeable harm standard in the processing of its requests.

(iv)    **Requests for Criminal History Records or Rap Sheets.**   The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet.   These criminal history records are not the same as material in an investigative "FBI file."   An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service.   For a fee, individuals can request a copy of their Identity History Summary Check.   Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks.   Additionally, requests can be submitted electronically at www.edo.cjis.gov.   For additional information, please contact CJIS directly at (304) 625-5590.

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)   (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)   information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

# EXHIBIT C

**Juan Esco**
640 S CURSON AVE APT 916
Los Angeles, CA 90036
juanesco@me.com
310-900-9501
**August 14, 2024:**

**FOIA/PA Appeal**
Federal Bureau of Investigation
Office of Information Policy
U.S. Department of Justice
6th Floor
441 G Street, NW
Washington, D.C. 20530-0001

**Subject:** Appeal of FOIA Request Denial – Request Number 1641150-0

Dear FOIA Appeals Officer,

I am writing to formally appeal the denial of my Freedom of Information Act (FOIA) request, identified by the reference number 1641150-0 which was submitted on July 16, 2024. I received a denial letter dated August 2, 2024 citing *5 U.S.C. § 552(b)(7)(A)* as the reason for withholding the requested information.

The denial was based on the assertion that the records pertain to an ongoing or prospective law enforcement proceeding. However, I respectfully submit that the case in question has been closed. As such, I believe that the exemption under 5 U.S.C. § 552(b)(7)(A) should no longer be applicable, and the requested records should be released.

I request that the FBI reconsider its position and provide the requested records. If the Bureau believes that portions of the records should still be withheld, I ask that the agency provide a detailed justification for each portion withheld and release all reasonably segregable non-exempt portions of the records as required by FOIA.

Thank you for your attention to this matter. I look forward to your prompt response. Please feel free to contact me if you require any additional information.

Sincerely,

Juan Esco

310-900-9501

# EXHIBIT D



**U.S. Department of Justice**
Office of Information Policy
*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

Juan Esco

          Re:   Appeal No. A-2024-02379
                 Request No. 1641150-0

juanesco@me.com

**VIA: Online Portal - 9/17/2024**

Dear Juan Esco:

You appealed from the action of the Federal Bureau of Investigation on your Freedom of Information Act (FOIA) request for access to the FBI-monitored recording for Case No. 2:23-CR-00331-DSF. I note that your appeal concerns the FBI's full denial of your request.

After carefully considering your appeal, and as a result of discussions between FBI personnel and this Office, I am remanding your request to the FBI for further processing. You may appeal any future adverse determination made by the FBI. If you would like to inquire about the status of this remanded request or to receive an estimated date of completion, please contact the FBI directly at (540) 868-4593.

If you have any questions regarding the action this Office has taken on your appeal, you may contact this Office and speak with the undersigned agency official by calling 202-514-3642.

If you are dissatisfied with my action on your appeal, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

                      Sincerely,

                   x *Jillian Warzynski*

                   Jillian Warzynski
                   Associate Chief, for Christina Troiani, Chief,
                   Administrative Appeals Staff

# EXHIBIT E



**U.S. Department of Justice**

_____

**Federal Bureau of Investigation**
_Washington, D.C. 20535_

October 9, 2024

JUAN ESCO
NUMBER 916
640 SOUTH CURSON AVENUE
LOS ANGELES, CA 90036

OIP Appeal Number: A-2024-02379
FOIPA Appeal No.: 1641150-0
Request No.: 1641150-0
Subject: ESCO, JUAN
(Recording Device Copy from Court
Case Number 2:23-CR-00331-DSF)

Dear Juan Esco:

This acknowledges your Freedom of Information/Privacy Acts (FOIPA) remanded appeal has been received by the FBI from the Office of Information and Policy for processing.  Below you will find check boxes and informational paragraphs about your request.  Please read each one carefully.

    ☑    We have opened your remanded appeal and will inform you of the results in future correspondence.

    ☐    We have converted your NFP into a FOIPA appeal; therefore, the NFP number originally assigned to your request will now appear as the FOIPA appeal number listed above.

    ☐    Your request for a fee waiver is being considered and you will be advised of the decision if fees are applicable.

Please check the status of your FOIPA request at www.vault.fbi.gov by clicking on "Check Status of your FOI/PA Request."  **Enter the OIP Appeal Number (ex. 201500123) listed above, without hyphens.**  Status updates are adjusted weekly.  The status of newly assigned requests may not be available until the next weekly update.  If the FOIPA has been closed the notice will indicate that appropriate correspondence has been mailed to the address on file.

Additional information about the FOIPA can be found at www.fbi.gov/foia.  Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov.  Please reference the FOIPA Request number listed above in all correspondence concerning your request.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

**FBI FOIPA Addendum**

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request. Part 1 of the Addendum includes standard responses that apply to all requests. Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information. Part 3 includes general information about FBI records, searches, and programs.

**Part 1: The standard responses below apply to all requests:**

(i) **5 U.S.C. § 552(c).** Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)]. FBI responses are limited to those records subject to the requirements of the FOIPA. Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii) **Intelligence Records.** To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)]. This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i) **Requests for Records about any Individual—Watch Lists.** The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)]. This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii) **Requests for Records about any Individual—Witness Security Program Records.** The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)]. This is a standard response and should not be read to indicate that such records do or do not exist.

(iii) **Requests for Confidential Informant Records.** The FBI can neither confirm nor deny the existence of confidential informant records pursuant to FOIA exemptions (b)(7)(D), (b)(7)(E), and (b)(7)(F) [5 U.S.C.§ § 552 (b)(7)(D), (b)(7)(E), and (b)(7)(F)] and Privacy Act exemption (j)(2) [5 U.S.C.§ 552a (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records would reveal confidential informant identities and information, expose law enforcement techniques, and endanger the life or physical safety of individuals. This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i) **Record Searches and Standard Search Policy.** The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems, such as the Central Records System (CRS), or locations where responsive records would reasonably be found. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions. The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. The standard search policy is a search for main entity records in the CRS. Unless specifically requested, a standard search does not include a search for reference entity records or administrative records of previous FOIPA requests.

   a. *Main Entity Records* – created for individuals or non-individuals who are the subjects or the focus of an investigation
   b. *Reference Entity Records*- created for individuals or non-individuals who are associated with a case but are not known subjects or the focus of an investigation

(ii) **FBI Records.** Founded in 1908, the FBI carries out a dual law enforcement and national security mission. As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii) **Foreseeable Harm Standard.** As amended in 2016, the Freedom of Information Act provides that a federal agency may withhold responsive records only if: (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates, or (2) disclosure is prohibited by law (5 United States Code, Section 552(a)(8)(A)(i)). The FBI considers this foreseeable harm standard in the processing of its requests.

(iv) **Requests for Criminal History Records or Rap Sheets.** The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet. These criminal history records are not the same as material in an investigative "FBI file." An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service. For a fee, individuals can request a copy of their Identity History Summary Check. Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks. Additionally, requests can be submitted electronically at www.edo.cjis.gov. For additional information, please contact CJIS directly at (304) 625-5590.

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example. information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual  pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information. the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government  service the release of which would compromise the testing or examination process;

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the  person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

# EXHIBIT F

*Juan Esco*
640 South Curson Ave # 916
Los Angeles, CA 90036
310-900-9501 | juanesco@me.com

**VIA OVERNIGHT MAIL**                                              October 28, 2024

**Office of Information Policy**
United States Department of Justice
441 G Street NW
6th Floor
Washington, D.C. 20530

**Subject: Appeal of FOIA Request Denial – FOIPA Request No. 1641150-0, FBI Investigative Case No. 166C-LA-3736498**

Dear Director of the Office of Information Policy,

I am writing to appeal the Federal Bureau of Investigation's (FBI) decision regarding my Freedom of Information/Privacy Act (FOIPA) request (FOIPA Request No. 1641150-0), dated October 18, 2024, which was denied under *5 U.S.C. § 552(b)(7)(A)*. My original request, filed on July 16, 2024, sought a specific recording from *Court Case No. 2:23-CR-00331-DSF*, related to FBI Investigative Case *No. 166C-LA-3736498*, involving an incriminating statement made by the defendant.

The FBI's decision states that the records requested are exempt because their release could interfere with ongoing enforcement proceedings. However, I believe that the following factors warrant reconsideration:

**1. Specificity and Limited Scope of Request**

My FOIA request is narrowly tailored to a single recording from a specific court case. The material sought is not a broad or generalized request, but a very specific part of an already recorded court proceeding. Therefore, the release of this recording, or a redacted version of it, should not interfere with any law enforcement activity beyond the scope of the case it pertains to. I respectfully request that the FBI reconsider releasing this recording, possibly with necessary redactions to protect sensitive information.

**2. No Foreseeable Harm to Enforcement Proceedings**

1

The FBI's application of *5 U.S.C. § 552(b)(7)(A)* does not appear to be fully justified given the specific and limited nature of my request. Since this case is already in court, the disclosure of this particular recording is unlikely to interfere with any ongoing or prospective enforcement proceedings. I ask the FBI to provide more detailed justification for withholding the entire recording rather than offering selective redaction or partial release.

### 3. My Legal and Public Interest

The information requested directly pertains to me and my legal situation, and it is in the public interest to have access to government records that can impact individuals' lives. Furthermore, this case has attracted considerable public interest, appearing in prominent media outlets such as the *Los Angeles Times* (July 19, 2023, *"Filmmaker Captures His Own 'Murder'"*) and the *Washington Post* (December 5, 2023, *"Hired Hitman Helped Victim Fake His Death — Then Worked With the FBI"*). The public's right to know the details of this case is crucial in ensuring transparency and accountability in government actions.

### 4. Segregability and Release of Non-Exempt Portions

Even if the FBI determines that portions of the recording must be withheld, I respectfully request that the agency release all reasonably segregable non-exempt portions of the record as required by FOIA. The release of a redacted or edited version would address the FBI's concerns while fulfilling my request.

### Conclusion:

For these reasons, I urge the Office of Information Policy to reconsider the FBI's decision and release the requested materials, or at least portions of the recording, with any necessary redactions. Enclosed is a copy of my original FOIA request, the FBI's denial letter, and all related documentation.

Thank you for your time and attention to this matter. I look forward to your prompt response.

Sincerely,

Juan Esco

*Enclosures:*

- Copy of original FOIA request (July 16, 2024)
- FBI's denial letter (October 18, 2024)
- Los Angeles Times Article

2



**U.S. Department of Justice**
Office of Information Policy
Sixth Floor
441 G Street, NW
Washington, DC 20530-0001

Telephone: (202) 514-3642

November 05, 2024

Juan Esco
juanesco@me.com

Dear Juan Esco:

This is to advise you that the Office of Information Policy of the U.S. Department of Justice received your administrative appeal from the action of the Federal Bureau of Investigation regarding Request No. 1641150 on 10/30/2024.

In an attempt to afford each appellant equal and impartial treatment, OIP has adopted a general practice of assigning appeals in the approximate order of receipt. Your appeal has been assigned number A-2025-00285. Please refer to this number in any future communication with OIP regarding this matter. Please note that if you provided an email address or another electronic means of communication with your request or appeal, this Office may respond to your appeal electronically even if you submitted your appeal to this Office via regular U.S. Mail.

We will notify you of the decision on your appeal as soon as we can. If you have any questions about the status of your appeal, you may contact me at 202-514-3642. If you have submitted your appeal through Freedom of Information Act STAR, you may also check the status of your appeal by logging into your account.

Sincerely,

*Priscilla Jones*

Priscilla Jones
Supervisory Administrative Specialist

**FedEx.**

October 31, 2024

Dear Customer,

The following is the proof-of-delivery for tracking number: 779583333286

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Mailroom |
| Signed for by: | J.SMITH | Delivery Location: | |
| Service type: | FedEx Standard Overnight | | |
| Special Handling: | Deliver Weekday | | Washington, DC, |
| | | Delivery date: | Oct 30, 2024 13:53 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 779583333286 | Ship Date: | Oct 29, 2024 |
| | | Weight: | 0.5 LB/0.23 KG |
| Recipient: | | Shipper: | |
| Washington, DC, US, | | LOS ANGELES, CA, US, | |

FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment.  Please check again later for a signature.

**FedEx.**

Thank you for choosing FedEx



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

October 18, 2024

JUAN ESCO
NUMBER 916
640 SOUTH CURSON AVENUE
LOS ANGELES, CA 90036

FOIPA Request No.: 1641150-0
Subject: ESCO, JUAN
(Recording Device Copy from Court
Case Number 2:23-CR-00331-DSF)

Dear Juan Esco:

This responds to your Freedom of Information/Privacy Acts (FOIPA) request. Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

The FBI has completed its search for records subject to the FOIPA that are responsive to your request. The material you requested is located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). 5 U.S.C. § 552(b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only
> to the extent that the production of such law enforcement records or
> information ... could reasonably be expected to interfere with
> enforcement proceedings...

The records responsive to your request are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings. Therefore, your request is being administratively closed. For a further explanation of this exemption, see the enclosed Explanation of Exemptions.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. "Part 1" of the Addendum includes standard responses that apply to all requests. "Part 2" includes additional standard responses that apply to all requests for records about yourself or any third party individuals. "Part 3" includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

Additional information about the FOIPA can be found at www.fbi.gov/foia. Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov. Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." If possible, please provide a copy of your original request and this response letter with your appeal.

You may seek dispute resolution services by emailing the FBI's FOIA Public Liaison at
foipaquestions@fbi.gov.   The subject heading should clearly state "Dispute Resolution Services."   Please also cite
the FOIPA Request Number assigned to your request so it may be easily identified.   You may also contact the Office
of Government Information Services (OGIS).   The contact information for OGIS is as follows: Office of Government
Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park,
Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile
at 202-741-5769.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosures

**EXHIBIT G**



**U.S. Department of Justice**
Office of Information Policy
*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

Juan Esco

Re:    Appeal No. A-2025-00285
Request No. 1641150

juanesco@me.com

**VIA: Email - 1/6/2025**

Dear Juan Esco:

You appealed from the action of the Federal Bureau of Investigation (FBI) on your Freedom of Information Act (FOIA) request for access to the FBI-monitored recording device for Case No. 2:23-CR-00331-DSF. I note that your appeal concerns the FBI's withholding of responsive records pursuant to Exemption (7)(A).

After carefully considering your appeal, and as a result of discussions between FBI personnel and this Office, I am remanding your request to FBI for further processing of the responsive records. Although the FBI invoked Exemption 7(A) of the FOIA, 5 U.S.C. § 552(b)(7)(A), at the time your initial request was processed, that exemption is no longer applicable to withhold the records in full. Consequently, the FBI will process and send any releasable records to you directly, subject to any applicable fees. You may appeal any future adverse determination made by the FBI. If you would like to inquire about the status of this remanded request or to receive an estimated date of completion, please contact the FBI directly at 540-868-4593.

If you have any questions regarding the action this Office has taken on your appeal, you may contact this Office and speak with the undersigned agency official by calling 202-514-3642.

If you are dissatisfied with my action on your appeal, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

X _Rianna Barrett_

Rianna Barrett
Associate Chief, for Christina Troiani, Chief,
Administrative Appeals Staff

# EXHIBIT H



**U.S. Department of Justice**

Federal Bureau of Investigation
*Washington, D.C. 20535*

March 25, 2025

JUAN ESCO
NUMBER 916
640 SOUTH CURSON AVENUE
LOS ANGELES, CA 90036

FOIPA Request No.: 1641150-000
Subject: ESCO, JUAN
(Recording Device Copy from Court Case Number
2:23-CR-00331-DSF)

Dear Juan Esco:

This responds to your Freedom of Information/Privacy Acts (FOIPA) request. Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

The FBI has completed its search for records subject to the FOIPA that are responsive to your request. The material you requested is located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). 5 U.S.C. § 552(b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only
> to the extent that the production of such law enforcement records or
> information ... could reasonably be expected to interfere with
> enforcement proceedings...

The records responsive to your request are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings. Therefore, your request is being administratively closed. For a further explanation of this exemption, see the enclosed Explanation of Exemptions.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. **"Part 1"** of the Addendum includes standard responses that apply to all requests. **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third-party individuals. **"Part 3"** includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

Additional information about the FOIPA can be found at www.fbi.gov/foia. Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov. Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the FBI's determination in response to this request, you may proceed under any or all of the following options:

- You may seek dispute resolution services through the FBI directly by emailing our FOIA Public Liaison at foipaquestions@fbi.gov. The subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

- You may contact the Office of Government Information Services (OGIS), who serves as the federal FOIA Ombudsman. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

- You may file an administrative appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. **Pursuant to 28 C.F.R. § 16.8(a), your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of this response to your request.** If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please reference the FOIPA Request Number listed above in your correspondence so it may be easily identified. If possible, please provide a copy of your original request and this response letter with your appeal.

Note: Utilizing the FBI's dispute resolution services or requesting mediation through OGIS does not toll the ninety (90) day limit to file a timely appeal with OIP.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosures

## FBI FOIPA Addendum

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request. Part 1 of the Addendum includes standard responses that apply to all requests. Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information. Part 3 includes general information about FBI records, searches, and programs.

**Part 1: The standard responses below apply to all requests:**

(i) **5 U.S.C. § 552(c).** Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)]. FBI responses are limited to those records subject to the requirements of the FOIPA. Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii) **Intelligence Records.** To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)]. This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i) **Requests for Records about any Individual—Watch Lists.** The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)]. This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii) **Requests for Records about any Individual—Witness Security Program Records.** The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)]. This is a standard response and should not be read to indicate that such records do or do not exist.

(iii) **Requests for Confidential Informant Records.** The FBI can neither confirm nor deny the existence of confidential informant records pursuant to FOIA exemptions (b)(7)(D), (b)(7)(E), and (b)(7)(F) [5 U.S.C.§ § 552 (b)(7)(D), (b)(7)(E), and (b)(7)(F)] and Privacy Act exemption (j)(2) [5 U.S.C.§ 552a (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records would reveal confidential informant identities and information, expose law enforcement techniques, and endanger the life or physical safety of individuals. This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i) **Record Searches and Standard Search Policy.** The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems, such as the Central Records System (CRS), or locations where responsive records would reasonably be found. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions. The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. The standard search policy is a search for main entity records in the CRS. Unless specifically requested, a standard search does <u>not</u> include a search for reference entity records or administrative records of previous FOIPA requests.

   a. *Main Entity Records* – created for individuals or non-individuals who are the subjects or the focus of an investigation
   b. *Reference Entity Records*- created for individuals or non-individuals who are associated with a case but are not known subjects or the focus of an investigation

(ii) **FBI Records.** Founded in 1908, the FBI carries out a dual law enforcement and national security mission. As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii) **Foreseeable Harm Standard.** As amended in 2016, the Freedom of Information Act provides that a federal agency may withhold responsive records only if: (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates, or (2) disclosure is prohibited by law (5 United States Code, Section 552(a)(8)(A)(i)). The FBI considers this foreseeable harm standard in the processing of its requests.

(iv) **Requests for Criminal History Records or Rap Sheets.** The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet. These criminal history records are not the same as material in an investigative "FBI file." An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service. For a fee, individuals can request a copy of their Identity History Summary Check. Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks. Additionally, requests can be submitted electronically at www.edo.cjis.gov. For additional information, please contact CJIS directly at (304) 625-5590.

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue. or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation. information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example. information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs. or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18. United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence:

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process:

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

# EXHIBIT I



**U.S. Department of Justice**
Office of Information Policy
Sixth Floor
441 G Street, NW
Washington, DC 20530-0001

Telephone: (202) 514-3642

April 03, 2025

Juan Esco
Apartment 916
640 S. Curson Avenue
Los Angeles, CA 90036
juanesco@me.com

Dear Juan Esco:

This is to advise you that the Office of Information Policy of the U.S. Department of Justice received your administrative appeal from the failure of the Federal Bureau of Investigation to respond to Request No. 1641150 on 04/01/2025.

In an attempt to afford each appellant equal and impartial treatment, OIP has adopted a general practice of assigning appeals in the approximate order of receipt. Your appeal has been assigned number A-2025-01224. Please refer to this number in any future communication with OIP regarding this matter. Please note that if you provided an email address or another electronic means of communication with your request or appeal, this Office may respond to your appeal electronically even if you submitted your appeal to this Office via regular U.S. Mail.

We will notify you of the decision on your appeal as soon as we can. If you have any questions about the status of your appeal, you may contact me at 202-514-3642. If you have submitted your appeal through Freedom of Information Act STAR, you may also check the status of your appeal by logging into your account.

Sincerely,

*Priscilla Jones*

Priscilla Jones
Supervisory Administrative Specialist



**U.S. Department of Justice**
Office of Information Policy
*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

April 01, 2025

juanesco@me.com

Dear Juan Esco:

This is to advise you that the Office of Information Policy of the U.S. Department of Justice received your administrative appeal from the action of the Federal Bureau of Investigation regarding Request No. 1641150-000 (3-25-2025) on 03/31/2025.

In an attempt to afford each appellant equal and impartial treatment, OIP has adopted a general practice of assigning appeals in the approximate order of receipt. Your appeal has been assigned number A-2025-01174. Please refer to this number in any future communication with OIP regarding this matter. Please note that if you provided an email address or another electronic means of communication with your request or appeal, this Office may respond to your appeal electronically even if you submitted your appeal to this Office via regular U.S. Mail.

We will notify you of the decision on your appeal as soon as we can. If you have any questions about the status of your appeal, you may contact me at 202-514-3642. If you have submitted your appeal through Freedom of Information Act STAR, you may also check the status of your appeal by logging into your account.

Sincerely,

*Priscilla Jones*

Priscilla Jones
Supervisory Administrative Specialist

# JUAN ESCO

640 S CURSON AVE
APT 916
LOS ANGELES, CALIFORNIA 90036
310-900-9501 | juanesco@me.com



**VIA OVERNIGHT MAIL**

March 31, 2025

**Director**
Freedom of Information Appeal
U.S. Department of Justice
Office of Information Policy
Sixth Floor
441 G Street, NW
Washington, DC 20001

> **Re: Continued Noncompliance with OIP Remand – FOIA Request No.**
> **1641150-000 / Appeal No. A-2025-00285**

Dear Director,

I am writing to formally notify your office of the FBI's failure to comply with your January 6, 2025 decision in Appeal *No. A-2025-00285* regarding FOIA Request *No. 1641150-000*. Despite your clear determination that Exemption 7(A) no longer applied, and your directive that the FBI process my request, the agency has issued a second denial—again citing Exemption 7(A) —on March 25, 2025.

This denial contradicts the ruling issued by your office and undermines the authority of the Department of Justice's FOIA appeals process. I respectfully request that OIP take formal steps to enforce its directive and compel the FBI to comply in full.

The records I seek include three specific files that were admitted into evidence and publicly played during a federal jury trial (Case *No. 2:23-cr-00222-RFB-NJK*), and are part of FBI File *No. 166C-LA-3736498*:

1. **ZOOM0007.MP3** – March 23, 2023, 10:27 a.m. (Exhibit 3-A)
2. **ZOOM0008.MP3** – March 23, 2023, 11:18 a.m. (Exhibit 4-A)
3. **0541.001.cam1.mp4** – June 21, 2023 Las Vegas FBI sting (Exhibit 6-A / 6-B)

These materials were not only confirmed by FBI agents under oath, but played in open court before a jury, and formally stipulated to as uncontested exhibits. I have attached certified court transcripts and stipulations verifying the existence, admissibility, and public disclosure of these recordings.

The FBI's continued refusal to release these records—despite both your ruling and their public use—raises serious concerns about transparency and compliance. I urge your office to intervene and ensure that the FBI releases the non-exempt portions of these materials without further delay.

Please confirm receipt of this letter and advise if any further action is required on my part.

*Enclosures:*

- FBI Denial Letter (March 25, 2025)
- OIP Ruling (Jan 6, 2025)
- Trial Exhibits & Transcripts Confirming FBI Recordings

Sincerely,

By;  Juan Esco



April 01, 2025

Dear Customer,

The following is the proof-of-delivery for tracking number: 880197951055

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Shipping/Receiving |
| Signed for by: | D.Thomas | Delivery Location: | U.S Department of Justice |
| Service type: | FedEx First Overnight | | 441 G Street, NW |
| Special Handling: | Deliver Weekday;<br>Adult Signature Required | | WASHINGTON, DC, 20001 |
| | | Delivery date: | Apr 1, 2025 10:28 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 880197951055 | Ship Date: | Mar 31, 2025 |
| | | Weight: | 0.5 LB/0.23 KG |

Recipient:
Director, Freedom of Information Appeal
U.S Department of Justice
441 G Street, NW
Six Floor
WASHINGTON, DC, US, 20001

Shipper:
J ESCO, TRANSIENT PRODUCTIONS
640 S CURSON AVE
APT 916
LOS ANGELES, CA, US, 90036

Reference                    Freedom of Information Appeal

Department Number            Office of Information Policy



Thank you for choosing FedEx

# EXHIBIT J



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

April 4, 2025

JUAN ESCO
NUMBER 916
640 SOUTH CURSON AVENUE
LOS ANGELES, CA 90036

FOIPA Request No.: 1641150-001
Subject: ESCO, JUAN
(Recording Device Copy from Court Case Number
2:23-CR-00331-DSF)

Dear Juan Esco:

This responds to your Freedom of Information/Privacy Acts (FOIPA) request. Please see the paragraphs below for relevant information specific to your request as well as the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

The FBI has completed its search for records subject to the FOIPA that are responsive to your request. The material you requested is located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). 5 U.S.C. § 552(b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only
> to the extent that the production of such law enforcement records or
> information ... could reasonably be expected to interfere with
> enforcement proceedings...

The records responsive to your request are law enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings. Therefore, your request is being administratively closed. For a further explanation of this exemption, see the enclosed Explanation of Exemptions.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. **"Part 1"** of the Addendum includes standard responses that apply to all requests. **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third-party individuals. **"Part 3"** includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

Additional information about the FOIPA can be found at www.fbi.gov/foia. Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov. Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the FBI's determination in response to this request, you may proceed under any or all of the following options:

- You may seek dispute resolution services through the FBI directly by emailing our FOIA Public Liaison at foipaquestions@fbi.gov. The subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

- You may contact the Office of Government Information Services (OGIS), who serves as the federal FOIA Ombudsman. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

- You may file an administrative appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. **Pursuant to 28 C.F.R. § 16.8(a), your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of this response to your request.** If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please reference the FOIPA Request Number listed above in your correspondence so it may be easily identified. If possible, please provide a copy of your original request and this response letter with your appeal.

Note: Utilizing the FBI's dispute resolution services or requesting mediation through OGIS does not toll the ninety (90) day limit to file a timely appeal with OIP.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosures

**FBI FOIPA Addendum**

As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request. Part 1 of the Addendum includes standard responses that apply to all requests. Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information. Part 3 includes general information about FBI records, searches, and programs.

**Part 1: The standard responses below apply to all requests:**

(i)     **5 U.S.C. § 552(c).** Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)]. FBI responses are limited to those records subject to the requirements of the FOIPA. Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii)    **Intelligence Records.** To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)]. This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i)     **Requests for Records about any Individual—Watch Lists.** The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)]. This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii)    **Requests for Records about any Individual—Witness Security Program Records.** The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)]. This is a standard response and should not be read to indicate that such records do or do not exist.

(iii)   **Requests for Confidential Informant Records.** The FBI can neither confirm nor deny the existence of confidential informant records pursuant to FOIA exemptions (b)(7)(D), (b)(7)(E), and (b)(7)(F) [5 U.S.C.§ § 552 (b)(7)(D), (b)(7)(E), and (b)(7)(F)] and Privacy Act exemption (j)(2) [5 U.S.C.§ 552a (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records would reveal confidential informant identities and information, expose law enforcement techniques, and endanger the life or physical safety of individuals. This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i)     **Record Searches and Standard Search Policy.** The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems, such as the Central Records System (CRS), or locations where responsive records would reasonably be found. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions. The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. The standard search policy is a search for main entity records in the CRS. Unless specifically requested, a standard search does _not_ include a search for reference entity records or administrative records of previous FOIPA requests.

        a.   _Main Entity Records_ – created for individuals or non-individuals who are the subjects or the focus of an investigation

        b.   _Reference Entity Records_- created for individuals or non-individuals who are associated with a case but are not known subjects or the focus of an investigation

(ii)    **FBI Records.** Founded in 1908, the FBI carries out a dual law enforcement and national security mission. As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii)   **Foreseeable Harm Standard.** As amended in 2016, the Freedom of Information Act provides that a federal agency may withhold responsive records only if: (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates, or (2) disclosure is prohibited by law (5 United States Code, Section 552(a)(8)(A)(i)). The FBI considers this foreseeable harm standard in the processing of its requests.

(iv)    **Requests for Criminal History Records or Rap Sheets.** The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet. These criminal history records are not the same as material in an investigative "FBI file." An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service. For a fee, individuals can request a copy of their Identity History Summary Check. Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks. Additionally, requests can be submitted electronically at www.edo.cjis.gov. For additional information, please contact CJIS directly at (304) 625-5590.

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual  pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government  service the release of which would compromise the testing or examination process;

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the  person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

# EXHIBIT K



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*

*441 G Street, NW*

*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

Juan Esco

Re:    Appeal No. A-2025-01327

Request No. 1641150-001

juanesco@me.com

**VIA: Email - 09/11/2025**

Dear Juan Esco:

You appealed from the action of the Federal Bureau of Investigation (FBI) on your Freedom of Information Act (FOIA) request for access to video footage in Case No. 2:23-CR-00331-DSF. I note that your appeal concerns the FBI's response dated April 4, 2025, withholding responsive records pursuant to Exemption (b)(7)(A).

After carefully considering your appeal, I am affirming, on modified grounds, the FBI's action on your request. The FOIA provides for disclosure of many agency records. At the same time, Congress included in the FOIA nine exemptions from disclosure that provide protection for important interests such as personal privacy, privileged communications, and certain law enforcement activities. To the extent that non-public responsive records exist, disclosure of such records, including law enforcement records, concerning a third-party individual would constitute a clearly unwarranted invasion of personal privacy, and could reasonably be expected to constitute an unwarranted invasion of personal privacy. See 5 U.S.C. § 552(b)(6), (7)(C). Further, it is reasonably foreseeable that releasing any non-public records, to the extent such records exist, would harm the interests protected by these exemptions. See, e.g., DOJ v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 780 (1989) (holding "as a categorical matter" pursuant to Exemption 7(C) that release of investigatory records concerning a third party "can reasonably be expected to invade" that person's privacy and that such an invasion is unwarranted in the absence of an overriding public interest).

Please be advised that this Office's decision was made only after a full review of this matter. Your appeal was assigned to an attorney with this Office who thoroughly reviewed and analyzed your appeal, your underlying request, and the action of the FBI in response to your request.

If you are dissatisfied with my action on your appeal, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

For your information, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; email at ogis@nara.gov; telephone at 202-741-5770; toll-free at 1-877-684-6448; or facsimile at 202-741-5769. If you have any questions regarding the action this Office has taken on your appeal, you may contact this Office and speak with the undersigned agency official by calling 202-514-3642.

Sincerely,

X_____

Christina Troiani
Chief, Administrative Appeals Staff



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

Juan Esco

Re:  Appeal Nos. A-2025-01174 &
A-2025-01224

Request No. 1641150-000

juanesco@me.com

**VIA: Online Portal - 09/10/2025**

Dear Juan Esco:

You appealed from the action of the Federal Bureau of Investigation (FBI) on your remanded Freedom of Information Act (FOIA) request for access to the FBI-monitored recording device for Case No. 2:23-CR-00331-DSF. I note that your appeals concern the FBI's withholding of responsive records pursuant to Exemption (b)(7)(A).

After carefully considering your appeals, I am affirming, on partly modified grounds, the FBI's action on your remanded request. The FOIA provides for disclosure of many agency records. At the same time, Congress included in the FOIA nine exemptions from disclosure that provide protection for important interests such as personal privacy, privileged communications, and certain law enforcement activities. To the extent that non-public responsive records exist, disclosure of such records, including law enforcement records, concerning a third-party individual would constitute a clearly unwarranted invasion of personal privacy, and could reasonably be expected to constitute an unwarranted invasion of personal privacy. See 5 U.S.C. § 552(b)(6), (7)(C). Further, it is reasonably foreseeable that releasing any non-public records, to the extent such records exist, would harm the interests protected by these exemptions. See, e.g., DOJ v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 780 (1989) (holding "as a categorical matter" pursuant to Exemption 7(C) that release of investigatory records concerning a third party "can reasonably be expected to invade" that person's privacy and that such an invasion is unwarranted in the absence of an overriding public interest).

Finally, by letter dated April 3, 2025, this Office informed you that your additional appeal from your FOIA request for the above-referenced records had been received by this Office and would be assigned for adjudication under Appeal No. A-2025-01224. However, this Office subsequently learned that your appeal file was a duplicate of Appeal No. A-2025-01174.

In light of these circumstances, I am administratively closing Appeal No. A-2025-01224 in this Office.

Please be advised that this Office's decision was made only after a full review of this matter. Your appeals were assigned to an attorney with this Office who thoroughly reviewed and analyzed your appeals, your underlying request, and the action of the FBI in response to your request.

If you are dissatisfied with my action on your appeals, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B).

For your information, the Office of Government Information Services (OGIS) offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; email at ogis@nara.gov; telephone at 202-741-5770; toll-free at 1-877-684-6448; or facsimile at 202-741-5769. If you have any questions regarding the action this Office has taken on your appeals, you may contact this Office and speak with the undersigned agency official by calling 202-514-3642.

Sincerely,

X _____

Christina Troiani
Chief, Administrative Appeals Staff

**EXHIBIT L**

EXHIBIT 6-A, 6-B
Recording: 0541.001.cam1.mp4
Timestamp:
Date: June 21, 2023
Participants:  Michael Sherwood ("SHERWOOD")
                      Fereidoun Khalilian ("DEFENDANT")

| SPEAKER | TRANSCRIPTION |
|---|---|
| DEFENDANT | I was going to kill him myself. I bought a gun, I was coming to LA. You saved me from myself. I was going to kill him. I was going to stand outside of his place till he comes out. I was going to fucking shoot him in his fucking head. |

Exhibit 6-A
Page 1 of 1

EXHIBIT 3-A
Recording: ZOOM0007.MP3
Timestamps: 1:29-2:12
Date: March 23, 2023, 10:27 a.m.
Participants:    Michael Sherwood ("SHERWOOD")
                 Fereidoun Khalilian ("DEFENDANT")

| SPEAKER | TRANSCRIPTION |
|---|---|
| SHERWOOD | Hey, those guys, the ones we sent the first payment to, for Juan's, like, you know, Juan's thing.  The ones that took out Juan. Basically, so they got rid of his body, you know, the ones that killed him. They basically, they're asking for another thousand. So, I'm wondering if you would— that account for right now, the one that I sent you— |
| DEFENDANT | No problem. |
| SHERWOOD | Can you send me— |
| DEFENDANT | Do it through CashApp or through Zelle? |
| SHERWOOD | If you could Zelle the account I sent you yesterday, I'm just going to take it out of the business account so it doesn't look weird. And I'm gonna give it to them so we can just be done with them. |
| DEFENDANT | How much you want me to send? |
| SHERWOOD | If you could just send them a thousand, each. There was only three of them. |
| DEFENDANT | Ok I'll send it right now. |



GOVERNMENT
EXHIBIT

I

Exhibit 3-A
Page 1 of 1

EXHIBIT 4-A
Recording: ZOOM0008.MP3
Timestamp:
Date: March 23, 2023, 11:18 a.m
Participants:  Michael Sherwood ("SHERWOOD")
               Fereidoun Khalilian ("DEFENDANT")

| SPEAKER | TRANSCRIPTION |
|---|---|
| SHERWOOD | Yeah, everything's good, I just wanted to let you know I got it and I've already sent it off to them. I just gave them $1250 each. |
| DEFENDANT | Thank you, thank you, sir.  His body, nobody is going to be able to find him, huh? |
| SHERWOOD | No, no one's going to be able to find him. |
| DEFENDANT | Alright, cool. |
| SHERWOOD | They actually asked if you wanted a souvenir. |
| DEFENDANT | Yes.  No, no I don't. |
| SHERWOOD | [Laughs] I told them I'd ask, but that's about it. |
| DEFENDANT | Yeah, they like to cut heads and fingers and shit. |



GOVERNMENT
EXHIBIT

I

Exhibit 4-A
Page 1 of 1

E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JEREMIAH LEVINE (Cal. Bar No. 288377)
SARA VARGAS (Cal. Bar No. 313370)
Assistant United States Attorneys
Violent & Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2400
     Facsimile: (213) 894-3713
     E-mail:  Sara.Vargas@usdoj.gov
              Jeremiah.Levine@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 23-00331-DSF |
|---|---|
| Plaintiff, | TRIAL STIPULATION REGARDING UNCONTESTED EXHIBITS |
| v. | Trial Date: October 24, 2023 |
| FEREIDOUN KHALILIAN, aka "Prince Fred," "Fred," | Trial Time: 8:30 a.m. Location: Courtroom of the Hon. Dale S. Fischer |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Sara Vargas and Jeremiah Levine, and defendant FEREIDOUN KHALILIAN, by and through his attorneys of record, Deputy Federal Public Defenders Adam Olin

and Jonathan Aminoff, hereby agree and stipulate that the following exhibits are admissible as evidence[1] in the above-captioned trial:

1.    Exhibits 1-A through and including 1-F, audio recordings from March 26, 2023 (166C-LA-3736498_0000010_1A0000010_0000001.m4a_);

2.    Exhibits 2-A through and including 2-L, audio recordings from March 28, 2023 (166C-LA-3736498_0000010_1A0000010_0000002.m4a);

3.    Exhibit 3-A, an audio recording from March 23, 2023 (ZOOM0007.MP3);

4.    Exhibit 4-A, an audio recording from March 23, 2023 (ZOOM0008.MP3);

5.    Exhibit 5-A, an audio recording from April 15 23, 2023 (April_15.2023_whatsapp_call_between_sherwood_and_fred.mp3);

6.    Exhibits 6-A and 6-B, audio recordings from June 21, 2023 (0541.001.cam1.mp4);

7.    Exhibit 10-A, an audio recording from March 22, 2023 (ZOOM0006.MP3);

//

//

//

[1] The defense reserves its right to argue under Federal Rule of Evidence 106 that additional portions of the recordings that are the subject of this stipulation should be played.

2

8.    Exhibits 11 through and including 17, 19, 19-A, 21, 22, 23, 24, 25, 30, and 32, WhatsApp and iMessage communications and contents sent between January 28, 2022 and March 16, 2023; and

9.    Exhibits 28 and 29, CashApp receipts from March 17, 2023.

IT IS SO STIPULATED.

Dated: 10/23/2023                    Respectfully submitted,

                                     E. MARTIN ESTRADA
                                     United States Attorney

                                     MACK E. JENKINS
                                     Assistant United States Attorney
                                     Chief, Criminal Division

                                     _____
                                     SARA VARGAS
                                     JEREMIAH LEVINE
                                     Assistant United States Attorneys

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

Dated: 10/23/2023                    /s/*
                                     _____
                                     ADAM OLIN
                                     JONATHAN AMINOFF
                                     Deputy Federal Public Defenders
                                     Attorney for Defendant
                                     FEREIDOUN KHALILIAN

                                     * Mr. Olin gave authorization to e-
                                     sign on his behalf via telephone on
                                     October 23, 2023.

3

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 68 of 103   Page ID
Case 2:23-cr-00222-RFB-NJK   Document 680-2   Filed 06/21/24   Page 25 of 281
#:68

231

he would be able to come visit Mr. Sherwood.

Q    Did he ever visit Mr. Sherwood?

A    He did.

Q    Where?

A    In Las Vegas.

Q    So in Las Vegas, how did Mr. Sherwood and the defendant end up meeting?

A    Mr. Khalilian had asked Mr. Sherwood to pick him up from the airport when Mr. Khalilian landed, and that's exactly what Mr. Sherwood did.

Q    Was Mr. Sherwood doing that at your direction?

A    He was.

Q    I assume -- am I correct in thinking that Mr. Sherwood picked up the defendant in his car?

A    He did.

Q    Was there a recording device in the car?

A    Yes, there was.

Q    Who put it there?

A    I did.

Q    Direct your attention, please, to Government Exhibit 6A.

A    Okay.

Q    What is 6A?

A    This is a recorded video clip.

Q    Have you watched it?

232

A    I have.

Q    What -- in general terms, what does it portray?

A    This is a video taken from the inside of Mr. Sherwood's vehicle after he picked up Mr. Khalilian, and it portrays Mr. Khalilian and Mr. Sherwood together -- speaking together.

MR. LEVINE:  Your Honor, the Government moves to admit Exhibit 6A, please.

THE COURT:  Any objection?

MR. AMINOFF:  No, Your Honor.

THE COURT:  It's admitted.

(Marked for identification and received into evidence Exhibit No. 6A.)

MR. LEVINE:  Thank you.

Can we please play 6A.

(The audio commenced playing before the jury.)

Q    BY MR. LEVINE:  After Mr. Sherwood says he -- and please forgive my language -- "Ask me to fucking, you know, basically, what, fucking kill his ass," does the defendant dispute that he asked Mr. Sherwood to kill Mr. Esco?

A    No.

Q    I'd like to direct your attention to Exhibit 6B, please.

A    Okay.

Q    What is 6B?

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 70 of 103    Page ID
Case 2:23-cr-00222-RFB-NJK    Document 700-2    Filed 06/21/24    Page 27 of 281
#:70

233

A        This is a continuation -- it's another video segment.   It's a continuation of the segment we just watched.

Q        And have you watched this exhibit?

A        I have.

Q        You recognized it from the recording that we -- that was -- that you made in the car?

A        Yes.

MR. LEVINE:   Your Honor, the Government moves to admit 6B, please.

THE COURT:   Any objection?

MR. AMINOFF:   No, Your Honor.

THE COURT:   It's admitted.   Thank you.

(Marked for identification and received into evidence Exhibit No. 6B.)

MR. LEVINE:   Can we please play 6B.

(The audio commenced playing before the jury.)

MR. LEVINE:   May I have just a moment, please, Your Honor.

Nothing further from the Government for Mr. Fukuda at this time.

THE COURT:   Cross-examination.

**CROSS-EXAMINATION**

BY MR. AMINOFF:

Q        Good morning, Special Agent.

A        Good morning.

# EXHIBIT M

Case 2:25-cv-08668-CV-KS   Document 1   Filed 09/12/25   Page 72 of 103   Page ID #:72

# Los Angeles Times

CALIFORNIA

# A filmmaker feared his subject had turned on him. So he staged his own murder



Fereidoun "Prince Fred" Khalilian during filming of J. Esco's documentary at Khalilian's Los Angeles apartment in July 2019. (Juan Esco)

How a documentary morphed into faked murder, FBI sting operation - Los Angeles Times    8/20/24, 3:57 PM



**By Noah Goldberg**
Staff Writer  |  X Follow

July 10, 2023 5 AM PT

FOR SUBSCRIBERS

 man lies flat on his stomach on the floor of an apartment high above the La Brea Tar Pits.

He isn't moving. His hands are tied behind his back. His face rests in a pool of blood spilling from his neck.

A glass candleholder is shattered on the ground nearby and a chair is knocked over, signs of a struggle in the otherwise neat apartment.

On the wall is a corkboard dotted with cutouts of articles, court papers and photographs. Red string leads between related incidents along with photos and names and dates. All the string ties back to a photo at the top of a man: "Prince Fred."

It could be a scene out of a movie. Someday, it probably will be. The man on the floor is a documentary filmmaker. What started as an exposé of a wealthy businessman with a checkered past had morphed into a low-budget, high-stakes, life-or-death drama.





J. Esco on the floor of his Los Angeles apartment.  (Courtesy of Anastasia Chorna)



J. Esco was working as a computer technician in Florida when Fereidoun "Prince Fred" Khalilian hired him for a repair job in 2009. He was soon working full time for Khalilian: a job offer at three times his salary was hard to refuse, Esco said.

Khalilian's lavish lifestyle impressed Esco. His boss ran in celebrity circles; he had helped open Paris Hilton's short-lived nightclub in Orlando, Fla. He drove a Range Rover and claimed to have a Bugatti and a Lamborghini at his house, according to prosecutors in a criminal complaint. He wore expensive jewelry and had a security team of at least four bodyguards who accompanied him when he went out, often spending tens of thousands of dollars in a single night at a club, the complaint said.

For a year, Esco ran IT for Khalilian's robocall company while helping his boss launch a social media music company. That came to an abrupt end when federal agents raided Khalilian's office in 2010.

"I hear a huge bang and I hear someone say, 'Don't f—ing touch your computers, don't touch your mouse,' " Esco recalled, saying agents pointed guns at him as he led them to the company's servers.

The raid resulted in a 2010 Federal Trade Commission lawsuit alleging that Khalilian misrepresented car warranties to unsuspecting customers. Khalilian and his company

were ordered to pay a $4.2-million judgment in the case.

After the raid, the company shut down and Esco was out of work.

Esco said his former boss promised to help him get back on his feet. "In my mind I was like, 'F— this, I'll never talk to this guy again.'"



Filmmaker J. Esco hoped a documentary about his former boss would be his big break in Hollywood. (Allen J. Schaben / Los Angeles Times)

A few years later, Esco moved to Los Angeles to try his hand in the entertainment

industry. He splurged on a high-end cinema camera and shot commercials and short films for free to build his portfolio.

Work was satisfying but hard to come by.

He produced dozens of commercials as well as some short films and a feature film, "Catalyst." He also began working in documentaries. He was cobbling together a living in Hollywood as a cinematographer and producer, but he was always on the lookout for the big project that might catapult him into more marquee work.

Esco was shooting an interview with boxing trainer Freddie Roach at hairstylist Giuseppe Franco's Beverly Hills studio in 2019 when Khalilian coincidentally arrived on set.

They kept the cameras rolling as Franco introduced his acquaintance Khalilian as a billionaire from Dubai. Khalilian said he was soon to be the next chief executive of Samsung, according to Esco.

"In my head I'm like, 'Oh, he's the biggest bulls—er in the world,' " Esco said.

After they cut, Khalilian recognized his former employee and the two reconnected, according to Esco.

As they spoke, Esco had an idea. He could make a documentary about his onetime boss — a high-rolling socialite with a shadowy background.

Esco said he went home and Googled Khalilian and found articles about scandals

involving the businessman spanning nearly two decades, with allegations including battery, extortion and "threats of mutilation, death and threats to family."



A partial list of legal claims involving Fereidoun Khalilian

In 2000, the Federal Trade Commission sued Khalilian for a telemarketing scheme in which he made deceptive pitches for travel packages, the FTC said. Khalilian argued in court papers that he had not committed any illegal conduct. He was ordered to pay $185,000 in a settlement in that case.

In 2006, Khalilian was charged with battery on a law enforcement officer. He pleaded no contest to a lower charge of disorderly intoxication, according to Florida court records.

In 2007, Khalilian was accused of battery and false imprisonment by a former employee, according to the Orlando Sentinel. He pleaded no contest to a misdemeanor battery charge in in the case, according to court records. His attorney argued that the charges were not strong and had a taxi driver and security guard testify that the victim "appeared happy and content after leaving Khalilian," according to the Sentinel.

In 2014, Khalilian was sued by a former business partner, Stefano Grossi, for allegedly misappropriating $1.7 million of Grossi's investments in their company, according to a lawsuit filed in Georgia. Khalilian also made a

deal with a Native American tribe for poker software for $9.4 million and excluded Grossi from the money, according to the complaint. After a jury trial, Khalilian was ordered to pay $4.7 million to Grossi in 2019. Khalilian's lawyer at the time said he intended to appeal "based on certain evidence that was excluded at trial."

In 2018, Khalilian was "exited" from his role at the audio company Monster after staff accused him of making "threats of mutilation, death, and threats to family," according to a Monster news release. A temporary restraining order was filed against Khalilian at the time by Monster. Khalilian claimed in a suit against Monster that the company's other executives made false accusations against him in order to "humiliate" him, the suit said. The case against Monster was dismissed by a federal judge.

"He's ... done a lot of stupid things and gotten himself in a lot of legal trouble," said David Lilenfeld, an attorney who's sued Khalilian twice. "He knows how to separate people from their money."

Khalilian has defended himself in court, arguing that allegations made against him in lawsuits and criminal cases were false. He has been ordered to pay settlements in some cases and pleaded no contest to lesser charges in criminal proceedings.

Esco thought the documentary could be his big break, but only if he could get Khalilian to participate. He came up with an unorthodox solution in the practice of documentary film: He would lie to his subject. To gain Khalilian's trust, Esco promised the film would cast him in a favorable light.

"I'm actually conning the con man to come into this documentary," Esco said.

The documentary got off the ground quickly, as Esco interviewed former business partners, bodyguards and even an ex-fiancee of Khalilian who he felt corroborated his view of Khalilian.

Khalilian explained his extravagant wealth by telling people he was an Arab prince — though his national origin changed depending on whom he was talking to, prosecutors and family said.



J. Esco assembled an investigation web on a wall in his apartment.  (Allen J. Schaben / Los Angeles Times)

How a documentary morphed into faked murder, FBI sting operation - Los Angeles Times                8/20/24, 3:57 PM

It wasn't until about a decade ago that he began referring to himself as "Prince Fred," Khalilian's first cousin Paradis Khalilian told The Times.

---



**HOLLYWOOD INC.**

**FOR SUBSCRIBERS**

**A Hollywood producer says he makes 'dreams come true.' But fraud allegations dog him**

**May 16, 2023**

---

"Everyone was calling him 'Prince, Prince, Prince,' " she said. "I asked him what's the story and he started laughing about it. ... He was like, 'I basically am a prince. I'm richer than every prince.'

"He has no royalty background," she said.

His background is Persian, not Arabic, said his cousin. He was born in Iran and moved to Turkey when he was 12, then Germany when he was 13 and eventually the United States when he turned 18, she said.

Esco spent four days interviewing Khalilian, gathering his subject's version of his life story. Khalilian seemed more interested in a Kardashian-style reality show than a documentary, Esco said.

"He wanted me to ask him as he got out of the car at the club, 'How'd you lose so much weight?' " Esco said.

Esco felt the documentary was taking shape. But the ruse could go on only so long.

A source whom Esco approached about an interview tipped off Khalilian, Esco said. Now he knew the real direction of the film — and he wasn't happy about it.



Mike Sherwood pulled up outside Esco's apartment in March 2022. He worked as the head of Khalilian's security team, and for the last month his boss had been complaining to him about Esco's documentary, saying it would ruin his life, according to the criminal complaint. Sherwood told his boss he would talk to Esco about the documentary, the complaint said.

Sherwood said he had no plans to resort to violence when he traveled to Los Angeles to speak with Esco — he hoped to talk the filmmaker out of making the documentary.

The two met on Esco's roof.

Esco showed Sherwood parts of the documentary about Khalilian and asked if the bodyguard would be open to an interview for the project, Esco said.

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 83 of 103   Page ID #:83



Mike Sherwood, who worked as the head of Fereidoun Khalilian's security team, in Los Angeles in June 2022. (Courtesy of J. Esco)

Sherwood agreed and was filmed in June 2022, though he continued to work for Khalilian. He said he spoke of the "positive and negative" sides of Khalilian in his interview and informed his employer that he had talked with Esco.

"I was very honest about his personality being up and down. But at that point I didn't think he was a horrible person," Sherwood said.

For a time, Khalilian appeared less bothered by Esco, Sherwood said. Then Esco began making calls to his former boss.

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 84 of 103   Page ID #:84

He started to goad Khalilian, calling from spoofed numbers and saying nothing other than *"habibi"* — an affectionate address in Arabic — or "Fred," and hoping that Khalilian would lose his temper, prosecutors said. Esco would record the calls. He called Khalilian about 20 times in early March 2023, according to prosecutors.

Esco said he hoped Khalilian might make threats that he could record and use in the documentary. And Khalilian did, according to the criminal complaint and audio recordings reviewed by The Times.



## FOR SUBSCRIBERS ONLY

Subscribers get exclusive access to this story

We're offering L.A. Times subscribers special access to our best journalism. Thank you for your support.

**Explore more Subscriber Exclusive content.**

"When I'm done with you, I'm going to cut each one of your f—ing fingers off," Khalilian said on one recorded call on March 8, according to a transcript in the complaint. "I'm going to f— you up, b—. I'm going to have your f—ing head."

Initially, Sherwood said, he did not take his boss' tirades seriously.

"Fred would lose his mind from time to time," Sherwood said.

But eventually, Sherwood said, he realized these threats were real. In March, Khalilian solicited Sherwood to have Esco killed for $20,000, a federal agent wrote in the criminal complaint.

The two messaged about Esco's home address and about how to get Esco outside. One idea they floated was to lure him out with an invitation from a "celebrity chef," according to the criminal complaint. Sherwood texted about hiring "Mexicans" for some job, paying them $1,000 each, according to the criminal complaint.

On March 16, Khalilian messaged Sherwood, according to prosecutors.

"I need this done."

"Already booked. Not leavin ya hanging. I got it," Sherwood texted Khalilian, according to the complaint. "I'll be there personally."



Fereidoun "Prince Fred" Khalilian during the filming of J. Esco's documentary in July 2019.    (Courtesy of J. Esco)

How a documentary morphed into faked murder, FBI sting operation - Los Angeles Times                8/26/24, 3:57 PM



J. Esco with source materials for his documentary about his former employer.  (Allen J. Schaben / Los Angeles Times)

When Esco woke up on March 17, he saw he had missed a text from Sherwood: "Call me when you can."

When Esco called back, Sherwood said, he filled him in on the whole arrangement.

Esco's mind went numb, he said. He knew that Khalilian hated him, but he hadn't thought his former boss would resort to violence.

Esco was on edge, even though Sherwood insisted he was in no real danger. ("Bro,

I'm obviously not going to do it," Sherwood recalled telling the filmmaker.)

Khalilian wanted proof of the murder by the next day, Sherwood told Esco.

---

### Column One

A showcase for compelling storytelling from the
Los Angeles Times.

**More stories**

---

The two hatched a plan so crazy it just might work: a faked murder, more high school film project than Hollywood motion picture.

Esco's girlfriend would take a photo of the crime scene. Then they would send the photo to Sherwood, who would turn it over to Khalilian as proof Esco was dead.

There was no time for a Hollywood makeup artist, as Esco wanted, so after the phone call, he went straight to Party City and purchased fake blood.

Esco choreographed the scene in his head. If someone were to murder him, how might it go down? He toppled a living room chair and shattered a glass candleholder on the ground. He imagined the killer might have used the candleholder to knock him out before slitting his throat with a knife, Esco said. He tied his hands up with an extension cord and lay still on the ground.

His girlfriend took dozens of photos and videos and Esco sent them to Sherwood, he said.

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 89 of 103    Page ID #:89

Sherwood passed along one of the images of the staged killing to Khalilian, according to prosecutors. He told Khalilian that he had hired a group of Mexicans to carry out the murder and that they buried Esco in a warehouse in Los Angeles, according to Sherwood and prosecutors. Within a minute, Khalilian sent $3,000 to Sherwood on Cash App from the account @$PrinceFredKhalilian, prosecutors said.

"For my guys," he wrote as a note, according to the complaint.

Less than six hours later, Khalilian sent an additional $3,500, prosecutors said.

All in all, Khalilian paid Sherwood a total of $12,500 for the faked killing, according to the criminal complaint.

At this point in the murder-for-hire double cross, Esco and Sherwood still had not contacted law enforcement. Sherwood wanted to wait longer to go, he said. He believed Esco was in no real danger because Khalilian thought he was dead — and Sherwood hoped to continue collecting the payment for the killing, he said. Why not profit off the situation? he thought.

Instead, Esco went to The Times with his story after reading about another murder-for-hire plot in the paper.



**CALIFORNIA**

**How feds choreographed an elaborate fake murder to stop L.A. developer's alleged plot**

Sept. 30, 2022

"I recently got a hit on my head and the hit man reached out to me yesterday, we worked together to fake my death," he wrote in an email on March 19, two days after they faked the murder.

Esco then went to the FBI and told agents his story. The agents were interested. But before making an arrest, they wanted Khalilian to admit he had ordered a killing, Sherwood said.



Esco spent months living in fear. The man he believed wanted him dead was still walking free and taking international trips. What if he visited L.A.? What if they crossed paths?

The FBI told him to stay off the grid, Esco said. He could not post on social media, let alone go out for a meal. Every few weeks he'd sneak to the grocery store and back. He left the country for a bit, with the FBI's permission, he said.

"I felt horrible. I was ordering in every day. It took a toll on me. You feel like you're a ghost," he said.

He worried that the FBI would not even arrest Khalilian. Maybe there wasn't enough evidence to make a case, he thought.

Meanwhile, the FBI was keeping Sherwood busy. Sherwood recorded calls between himself and Khalilian and sent evidence of the cash payments from his phone, according to the complaint. He had to screen-shot all of his communications with

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 91 of 103   Page ID #:91

Khalilian and share them with agents, Sherwood said.



Fereidoun "Prince Fred" Khalilian during the filming of J. Esco's documentary.  (Courtesy of J. Esco)

On March 23, six days after the faked killing, Khalilian and Sherwood got on the phone.

"His body, nobody is going to be able to find him, huh?" Khalilian said, according to a transcript from prosecutors.

"No, no one's going to be able to find him," Sherwood responded.

"All right, cool," Khalilian said.

"They actually asked if you wanted a souvenir," Sherwood said.

"Yes. No, no, I don't," Khalilian said.

Sherwood laughed.

"I told them I'd ask, but that's about it," Sherwood said.

"Yeah, they like to cut heads and fingers and s—," Khalilian said.

The FBI called Sherwood every day, he said. Khalilian said some stuff on their phone calls, but not enough, Sherwood said.

Finally, on June 20, the FBI told Sherwood to get ready for the final act.



Sherwood opened the door of his Porsche Macan on June 21 and prepared to put on the most important performance of his life.

Khalilian got into the car and the two men went for a drive around Las Vegas. The car was clean. Just a water bottle in the cup holder and a Dodgers hat on the dashboard. Federal agents had slipped a camera into the Dodgers hat, feeding sound and video directly to law enforcement, Sherwood said.

Case 2:25-cv-08668-CV-KS    Document 1    Filed 09/12/25    Page 93 of 103   Page ID #:93

Sherwood got straight to the point, he said.



Mike Sherwood in Los Angeles in June 2022.  (Courtesy of J. Esco)

He showed Khalilian the belongings of Esco the FBI had given him — Esco's passport, IDs, his Global Entry pass.

The belongings were further evidence, along with the staged photo, for Khalilian that the deed had been done.

As they sat in the car, Khalilian opened up, Sherwood said.

"If I didn't pay you to do it, I was going to kill him myself," Khalilian said, according to Sherwood.

The FBI would not share its recording of the conversation, but it did not dispute Sherwood's retelling.

The two pulled into the parking lot of a Dunkin' and suddenly were surrounded by law enforcement. FBI agents handcuffed Sherwood and Khalilian and tossed them into the back of a car, Sherwood said.

"I was like, 'They must have found [Esco].' He was like, 'They didn't find [Esco],'" Sherwood recalled.

Agents separated the two quickly, Sherwood recalled. They drove Sherwood back to the Porsche Macan and let him out. He was free to go.

"My hands still f—king hurt from the handcuffs," Sherwood said, laughing.

But Sherwood knew he'd gotten what agents needed.

---



**CALIFORNIA**

**Paris Hilton's former business partner arrested in alleged murder-for-hire conspiracy**

June 22, 2023

---

Agents arrested Khalilian and prosecutors charged him with murder for hire for the plot to kill Esco and the payments he made to Sherwood. A federal magistrate judge

in Nevada ordered Khalilian held without bond on June 26. He faces up to 10 years in prison.

"Mr. Khalilian maintains his innocence and looks forward to defending himself in court," said his attorneys, David Chesnoff and Richard Schonfeld. "The actions of the government witnesses surely need to be examined; however, it would be inappropriate to make any further comment at this time."

His attorneys argued in court that Khalilian should be released pretrial.

"While counsel understands that the charges are serious and that the government will assert that it has evidence in support of the charges, all remaining factors weigh strongly in favor of Mr. Khalilian being released," Chesnoff wrote.

His attorneys also said Khalilian has no felony criminal history and has "tremendous family support."

Esco said he wasn't thinking about his documentary when he and Sherwood faked the murder. Nor, he said, did he consider it when he delayed reporting the situation to the FBI.

But the film is on his mind again now.



J. Esco stands next to his investigation web on the wall of his Los Angeles apartment. At right is a detail of the collage. (Allen J. Schaben / Los Angeles Times)

As news of Khalilian's arrest made its way through Hollywood circles, production companies and financiers who had passed on the "Prince Fred" project reached back out to Esco and his partners.

"We had a really, really captivating character in Prince Fred. We had good interviews. But it didn't have that extra, extra thing," said Donovan Leitch Jr., Esco's producing partner. "The murder for hire was the hook that was the one thing that sets this apart from all the other documentaries."

Esco knows his approach to filmmaking put his life in jeopardy, but, he said, "Obviously, for the documentary, it's a really good thing.

"I wanted to be behind the scenes for everything," Esco said, "but it's like this was destined."

## More to Read

FOR SUBSCRIBERS

Inside the legal drama embroiling a Pasadena startup that grossed billions selling COVID tests

July 17, 2024



Film extra admits shooting Michael Latt, gets 35 years to life in prison

July 10, 2024



He was Leslie Van Houten's 'hippie lawyer.' Then, he defied Manson

July 3, 2024



 Noah Goldberg

Noah Goldberg covers breaking news for the Los Angeles Times. He worked previously in New York City as the Brooklyn courts reporter for the New York Daily News, covering major criminal trials as well as working on enterprise stories. Before

that, he was the criminal justice reporter for the Brooklyn Eagle.

Copyright © 2024, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# EXHIBIT N

# The Washington Post

**Morning Mix**

# Hired hitman helped victim fake his death — then worked with the FBI, feds say

The would-be victim posed for photos in which he was lying face down near a pool of fake blood, his hands bound behind his back

December 5, 2023

 By Jonathan Edwards

When his former boss offered him $20,000, bodyguard Michael Sherwood agreed to kill a filmmaker who was producing a documentary that portrayed the boss as a con man, he told The Washington Post. Instead, Sherwood warned the filmmaker, and the two teamed up to fake his death.

The filmmaker, Juan Esco, in March posed for photos with his wrists bound behind his back while lying face down near a pool of fake blood, next to a knocked-over chair and shattered glassware inside his Los Angeles apartment. He sent the photos to Sherwood, who said he relayed them to his former boss, Fereidoun "Fred" Khalilian, still unsure whether he had been serious.

Less than a minute later, Sherwood said, Khalilian sent $3,000 to his Cash App account. Sherwood said he and Esco took it as proof that Khalilian had indeed been serious.

"Juan's whole demeanor changed," Sherwood told The Post. "He was scared. He was terrified, and rightfully so."

On Wednesday, prosecutors announced that Khalilian, 51, had been charged with orchestrating a murder-for-hire plot and conspiracy to prevent a witness from testifying in his criminal trial. In a 53-page criminal complaint filed in the U.S. District Court for Nevada, prosecutors allege that Khalilian paid Sherwood to kill Esco and prevent the release of a documentary that portrayed Khalilian as a con man who had defrauded millions out of some of the most vulnerable people in society.

Khalilian's lawyer, federal public defender Rebecca Levy, did not respond to a request from The Post for comment.

Khalilian and Esco met in 2009 in Miami, FBI agent Michael Fukuda wrote in a sworn affidavit. Esco was working at a computer repair store and made such an impression on Khalilian by fixing his computer that Khalilian hired him to work at his telemarketing company, tripling his salary, Fukuda wrote.

During that time, Khalilian allegedly wore expensive jewelry and claimed to be a billionaire. He drove a Range Rover and said he had a Lamborghini and a Bugatti back at his mansion, Fukuda wrote. He allegedly traveled with at least four bodyguards and went to nightclubs where he would spend $50,000 in a night.

Khalilian explained his wealth by claiming to be a prince from the Middle East, but Esco grew suspicious of the claim after hearing him identify his homeland as several different Middle Eastern countries, depending on which business associate he was speaking with, Fukuda wrote.

While working at the telemarketing outfit, Esco learned it was a robocall service offering people extended warranties for their vehicles and began to suspect it was a fraud targeting the elderly, Fukuda wrote. Months later, the Federal Trade Commission pursued legal action against Khalilian's company, which resulted in it having to pay more than $4.2 million; federal authorities raided the business, which was shut down, the affidavit states.

Khalilian wanted Esco to keep working for him, but Esco declined because he suspected that Khalilian was "a con man that accumulated wealth through deception," Fukuda wrote.

The two fell out of touch, but in 2019, they ran into each other in L.A., according to Fukuda. Khalilian allegedly introduced himself to Esco's friends as a prince from Dubai, calling himself "Prince Fred." After the chance encounter, Esco researched Khalilian online, learning that he had been linked to numerous fraud cases, the affidavit alleges.

By then, Esco was working as a filmmaker and, intrigued by Khalilian's past, decided to make a documentary about his former boss's "life of fraud and deception," Fukuda wrote. He pitched the idea to Khalilian, downplaying the exposé part of the film and emphasizing the publicity he would get out of it, the affidavit states. Khalilian agreed to interviews that spanned five days.

After those were secured, Esco talked with Khalilian's bodyguards, investors and alleged fraud victims, Fukuda wrote. Bodyguards told Esco that Khalilian had them wear Secret Service pins and earpieces that weren't connected to radios, the affidavit states. On one reporting trip, Esco traveled to Oklahoma, where members of a Native American tribe said they had paid Khalilian $9 million for online gambling software, Fukuda wrote. The program didn't work, but Khalilian refused to return the money, the affidavit alleges.

In October 2021, Khalilian hired Sherwood as part of his security detail, Sherwood told The Post. At first, Sherwood enjoyed the work, but in early 2022, he grew alarmed by Khalilian's severe mood swings and his fixation on Esco, Fukuda wrote. He told Sherwood that Esco was "trying to ruin his life with this documentary," the affidavit states.

Sherwood offered to serve as an ambassador of sorts by talking with Esco to see if they could smooth things over, and when they met in L.A., he determined that Esco "was not a bad guy," Fukuda wrote.

Esco persisted with making his documentary. Earlier this year, Khalilian allegedly waged an intimidation campaign to try to scare him into scuttling the project. From late January to mid-March, Khalilian allegedly hired Sherwood to surveil and attack the filmmaker while stealing his equipment, work that Sherwood said he never did. Over five days in March, Khalilian allegedly left multiple voice-mail messages threatening Esco.

When threats failed, Khalilian allegedly offered Sherwood $20,000 to kill Esco.

Sherwood agreed, but instead of doing the job, he warned Esco about Khalilian's plan, Fukuda wrote. On March 17, Sherwood sent Khalilian several staged photos that appeared to show Esco's corpse, and less than a minute later, Khalilian allegedly sent payment via Cash App, with the message "For my guys." Six days later, he allegedly sent more money to Sherwood for those who had been hired to get "rid of his body." Khalilian allegedly paid out a total of $12,500, although Sherwood told The Post that almost half of that went into accounts controlled by the FBI.

In a follow-up phone call with Sherwood, Khalilian talked about others he thought had been working with Esco to "harass and harm him," including one person he was especially keen to deal with, Fukuda wrote. Thinking that Esco was dead, Khalilian allegedly said "one down, one to go" in a call Sherwood recorded and turned over to the FBI.

On June 12, Khalilian met Sherwood in Las Vegas, Fukuda wrote. He allegedly thanked his former bodyguard for killing Esco and talked about what he would have done if Sherwood hadn't.

"I was going to kill him myself," Khalilian allegedly said. "I bought a gun, I was coming to L.A. You saved me from myself."

Later that day, Khalilian was arrested. The next day, a federal judge in California ordered that he remain incarcerated as his case proceeded.

But Khalilian allegedly kept scheming. While in jail, he used other inmates' telephone access codes to call relatives and ex-employees, FBI agent Jesse Vazquez wrote in a sworn affidavit. He allegedly persuaded them to contact Sherwood and offer him money to change his trial testimony. In one exchange, an associate of Khalilian offered to pay Sherwood $400,000 if he agreed to "tell the truth" and change his testimony, according to Vazquez.

Instead, Sherwood told the FBI.

Khalilian was tried in October in L.A., but after four days of testimony, the judge discharged the case, ruling that a California federal court was not the proper venue. Prosecutors responded by having him indicted in Nevada, which was where Sherwood was when Khalilian allegedly hired him to kill Esco.

Khalilian, who remains in custody, has a new trial scheduled to start in February.

**What readers are saying**

The comments discuss a true crime documentary involving a conman and a filmmaker, with some focusing on the narrative style and production elements, such as non-linear plots and character backstories. There is also speculation about the implications for those involved, like...  Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.